# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

**UNITED STATES OF AMERICA**                                                    **PLAINTIFF**

**V.**                                                    **CAUSE NO. 3:17-cr-77-CWR-LRA**

**NIKOLAOS T. KOUTSOS, et al.**                                        **DEFENDANTS**

## ORDER

Nikolaos Koutsos, James Horrisberger, and Lai Saechao were arrested and charged with possession of marijuana with intent to distribute, conspiracy to possess marijuana with intent to distribute, and interstate transportation in aid of racketeering. Horrisberger and Saechao now move to suppress evidence resulting from their detention and arrest.[1] The Court has reviewed the parties' arguments and the evidence they presented at a suppression hearing. For the reasons stated below, the motion is DENIED.

**I.     Facts[2]**

On the afternoon of June 6, 2017, the U.S. Air Marine Operations Center (AMOC), which monitors all air traffic in the United States, contacted the U.S. Customs and Border Protection Air and Marine Operations, New Orleans Air and Marine Branch (NOAMB) concerning a Piper airplane. The NOAMB agents were told that the Piper, with registration N454SC, departed Oroville, California, and began a cross-country flight eastbound. The aircraft refueled in Los Alamos, New Mexico, and continued traveling eastward. And "[b]ased on the type of aircraft, current speed and previous travel, agents from NOAMB determined that the

---

[1] Koutsos had filed a Response in Support of Horrisberger's Motion to Suppress. Two months later, he withdrew that response and was excused from appearing at the suppression hearing.
[2] In an evidentiary hearing, the Court sits as a finder of fact and determines the credibility of witnesses. *United States v. Willis*, 525 F.2d 657, 659 (5th Cir. 1976); Fed. R. Evid. 104 cmt. ("To the extent that [admissibility] inquiries are factual, the judge acts as a trier of fact.").

1

aircraft was likely to land somewhere near Hattiesburg, Mississippi to refuel." Docket No. 44-1 at 2.

Shortly before 6 p.m. central time, Horrisberger landed the Piper at Copiah County Airport in Mississippi. Fifteen minutes later, as the Piper was taxiing towards the runway for departure, Agent Martin Smith of NOAMB hailed the Piper via radio to conduct a pilot certificate inspection (PCI).[3] Agent Smith, who was flying in a helicopter with Agent Grant Sibley, landed in front of the Piper—blocking the only active runway at the airport. Agent Smith informed Horrisberger that they were agents with the U.S. Department of Homeland Security. He asked Horrisberger to shut down the airplane's engines and present his documents for inspection.

Multiple factors triggered the PCI. The Piper was flying at 15,500 feet even though this type of plane typically flew above 18,000 feet on cross-country flights to take advantage of wind patterns, which would allow the plane to fly faster and more efficiently. The pilot did not file a flight plan and was not in communication with air traffic control.[4] The plane departed from northern California, an area known to produce large quantities of marijuana. Most significantly, having obtained the plane's registration number, AMOC prepared and sent NOAMB a report indicating that the owner of the Piper was "linked to possible narcotics and currency smuggler." Docket No. 60-1 at 1. The owner was a corporation, and Nikolaos Koutsos was its registered agent. The AMOC report also stated that Koutsos was linked to two other planes suspected of aviation smuggling. In March 2016, officers seized over $52,000 from Koutsos at the Orlando International Airport. In December 2012, Koutsos was also the "subject of [a] bulk currency

---

[3] Federal regulations require that pilots "must present their pilot certificate, medical certificate, logbook, or any other record required" if requested by an officer. 14 C.F.R. 61.51(i).
[4] Flying the plane above 18,000 feet would have required the filing of a flight plan. Based on his experience as a pilot, Agent Smith testified that a pilot flying this expected distance would file a flight plan.

2

encounter" in which $34,000 was found in his carry-on luggage at Tampa International Airport. *Id*.

The agents had received all of this information from AMOC by the time they made contact with Horrisberger and requested the PCI. According to Agent Smith, Horrisberger complied but said he was on a tight schedule and would meet the agents outside of the Piper. Horrisberger turned off the engines, exited the Piper, closed the door behind him, and walked about 20 feet away from the Piper toward the agents. He produced the requested documents. An FAA Inspector then gave the agents access to the terminal building and allowed them to complete the inspection inside the terminal.

Once they entered the building, Agent Smith started taking pictures of each document. Agent Smith asked Horrisberger if there was anyone else in the airplane; Horrisberger answered that there were two passengers. When Agent Smith requested Horrisberger's consent to look inside the Piper, Horrisberger answered no. Agent Smith then asked "if [Horrisberger's] passengers would be more comfortable if they exited the aircraft for the duration of the inspection." Docket No. 44-1 at 3. Horrisberger replied that the passengers were fine inside the airplane. Agent Smith again suggested that the passengers exit the plane since the "ambient air temperature was very hot" inside the closed Piper.[5] *Id*. Horrisberger again rejected this suggestion.

At some point during the PCI, Horrisberger allegedly became argumentative and asked how long the inspection would take. He then commented that the inspection was taking too long and stated he was going to call his attorney. Horrisberger then called an individual who he

---

[5] Defendants presented evidence that the temperature outside was more moderate than as described by Agent Smith. They submitted a graph of the temperature in Crystal Springs, Mississippi, that shows a high of 82 degrees on June 6, Docket No. 35, Ex. 3, and a picture of the Piper that suggests it was raining that afternoon, Docket No. 47, Ex. 3.

claimed was his attorney. After he got off the phone, he told the agents that his attorney said he was free to go.

By this time, Agent Smith had finished inspecting Horrisberger's documents.[6] The agents found that Horrisberger had produced every document required for the PCI. Each was in order.

The agents then told Horrisberger that they were concerned about the passengers and were going outside to check on them. They instructed Horrisberger to wait inside the terminal building, stating that he was not free to leave.

The agents walked across the tarmac to the Piper. Agent Smith testified that he approached the aircraft door on the left side of the rear fuselage, knocked on the door, and asked if anyone was inside. He heard no response. The agents tried to look through the windows but the curtains were closed. Agent Sibley, who was on the opposite side of the aircraft—the side without a door—said he then smelled marijuana emanating from the Piper. Agent Smith walked over to where Agent Sibley was standing and smelled marijuana as well.

The agents returned to the terminal building where Horrisberger had remained. Horrisberger was talking on his cell phone when Agent Smith told Horrisberger to put down his phone and turn around. Agent Smith handcuffed Horrisberger and patted him down. The search yielded no contraband or weapons.

The agents then returned to the Piper. Agent Smith knocked on the door and ordered all passengers to exit the plane. There was no response. He testified that he repeated this order several times and received no response, but heard movement inside the plane. Agent Smith then

---
[6] The parties dispute the length of the PCI. Horrisberger believed it lasted about 7-10 minutes, Agent Smith testified that it lasted approximately 15-20 minutes.

opened the door and saw two men "squatting down in a crouched position in the [a]isle of the aircraft toward the back near the door." Docket No. 44-1 at 3.

Agent Smith ordered the men to put their hands up and exit the Piper. The men complied. One man was identified as "Nick," the other as "Lai." Both were arrested. At this point, Agent Smith did not attempt to obtain a search warrant. He instead contacted Homeland Security to request a K-9 search of the plane and conduct interviews of the three men.

Within 40 to 45 minutes, additional Homeland Security agents arrived at the airport. Horrisberger's affidavit is the only evidence that provides a direct account of the K-9 search. Horrisberger states:

> The K-9 walked around the Piper and did not appear to give any positive indication for the presence of illegal drugs. The K-9 officer then directed the K-9 to the open door of the Piper and the K-9 still did not appear to give any positive indication for the presence of drugs. The K-9 officer then picked up the K-9 and carried it into the Piper. After that, the K-9 officer came out of the Piper and stated that the K-9 detected illegal drugs.

Docket No. 37, Ex. 1 at 3-4. The agents found black vacuumed-sealed, plastic garbage bags in the rear luggage area of the plane's cabin and along the front passenger seating area. They contained seven bundles of marijuana weighing a total of 248.26 pounds.

That same day, Koutsos, Horrisberger, and Saechao were charged with possession of marijuana with intent to distribute, conspiracy to possess marijuana with intent to distribute, interstate transportation in aid of racketeering. This motion followed.

**II. Legal Standard**

A defendant who seeks to have evidence suppressed typically bears the burden of proving that evidence was seized illegally. *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993). When a seizure is conducted without a warrant, however, the burden shifts to the government to justify the warrantless seizure. *Id.* In this instance, therefore, the government carries the burden of

proving, by a preponderance of the evidence, that the detention and subsequent search of Defendants were objectively reasonable under the Fourth Amendment. *See id.*; *United States v. McKinnon*, 681 F.3d 203, 207 (5th Cir. 2012).

**III. Discussion**

The Fourth Amendment to the United States Constitution guarantees individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Generally, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search or seizure." *United States v. Wallace*, 866 F.3d 605, 609 (5th Cir. 2017).

The Fifth Circuit has recognized "three tiers of citizen-police contact for purposes of fourth amendment analysis." *United States v. Zukas*, 843 F.2d 179, 181 (5th Cir. 1988) (citing *United States v. Berry,* 670 F.2d 583, 591 (5th Cir. 1982)). The first tier "involves no coercion or detention and does not implicate the fourth amendment." *Id*. The second tier, known as a *Terry* stop, "is a brief seizure that must be supported by reasonable suspicion, that is 'specific and articulable facts, which taken together with rational inferences from these facts reasonably warrant an intrusion.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). The final tier "is a full scale arrest which must be supported by probable cause." *United States v. Massi*, 761 F.3d 512, 520 (5th Cir. 2014).

These three tiers map nicely onto the facts and issues in this case. Each will be considered below.

**A. PCI**

Defendants contend that the officers lacked "jurisdiction" to conduct the PCI and for that reason alone the evidence should be suppressed. Docket No. 37 at 9-15. The Court disagrees.

6

Fifth Circuit case law is clear that "[a] ramp check [or PCI], authorized by state and federal law, permits officers of the [FAA] or police to examine the pilot's and aircraft's licensing and certification to ensure that they conform to FAA regulations." *Zukas*, 843 F.2d at 181.

Although it seems obvious that the agents were interested in Defendants' plane for drugs—and therefore that the PCI was merely a pretext to dig around—officers need no reason at all to conduct a regulatory stop. *Id*. Such an encounter does not implicate the Fourth Amendment. *Massi*, 761 F.3d at 521. "Therefore, we consider the issue of suppression to turn solely on what occurred after the [PCI]." *Id*.

### B. *Terry* Stop

Defendants argue that they should have been released after the pilot's papers were found satisfactory. Once the PCI morphed into an investigatory stop, they say, it was not based on reasonable articulable suspicion. *Massi*, 761 F.3d at 521.

Under *Terry*, if an officer can point to specific and articulable facts that lead him to reasonably suspect that a person is committing, or is about to commit, a crime, the officer may briefly detain him. *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014). "Our *Terry* inquiry involves examining whether the initial action was justified and, then, determining whether any subsequent action was reasonably related in scope to either the circumstances that justified the stop or to dispelling a reasonable suspicion that developed during the stop." *Massi*, 761 F.3d at 521.

To determine whether a *Terry* stop is supported by reasonable suspicion, courts consider the "totality of circumstances" as they were presented to the officer at the time of the encounter. *Hill*, 752 F.3d at 1033. Reasonable suspicion "may arise through the collective knowledge of the officers involved in the operation" so long as there is "some degree of communication" between

7

the officers at the time of the stop. *United States v. McPherson*, 630 F. App'x 330, 331 (5th Cir. 2016).

It is difficult to find the perfect precedent for every *Terry* stop. Two Fifth Circuit cases nevertheless prove instructive.

In *Zukas*, officers considered the following factors to justify a stop of a plane: (1) Zukas was flying a small aircraft with extended-range fuel tanks, tinted windows, and high-security locks; (2) the aircraft was owned by a company that often leased to drug smugglers; (3) Zukas paid cash for fuel and a hotel room; (4) the plane flew from Miami, a drug traffic center, to Texas and was headed to California, another drug traffic center; (5) the passenger appeared nervous, wore gold jewelry, and carried a large amount of cash; and (6) Zukas had prior arrests for drug smuggling. 843 F.2d at 182-83. Considering these factors together, the Fifth Circuit concluded that there was reasonable suspicion to support the investigatory detention of Zukas and his passenger. *Id*.

In *Massi*, another analogous case, AMOC suspected the defendants were transporting drugs via airplane based on the following factors: the flight made an unusually high number of refueling stops on a cross-country trip; Massi had recently traveled to Tijuana, Mexico, "a known hub of the illegal drug trade"; and the plane's registered owner had been convicted of drug trafficking 20 years earlier. 761 F.3d at 522. AMOC passed this information to local police and Homeland Security agents. The officers then conducted a PCI which turned into an investigatory stop. *Id*. Based on these circumstances, the Fifth Circuit found that reasonable suspicion existed to justify the prolonged stop. *Id*.

In this case, the government suggests that several factors support a finding of reasonable suspicion: (1) the plane's lower-than-typical altitude on a cross-country flight; (2) Horrisberger's

decisions not to submit a flight plan and not to communicate with air traffic control; (3) the flight originated in northern California, a known drug-production area; (4) the plane was linked to Koutsos, a person involved in bulk cash smuggling and possible marijuana trafficking.

All of these facts were known to the government prior to the PCI. But the government claims that the agents' suspicions only grew during the PCI. First, Horrisberger asked to conduct the PCI outside of the Piper even though he claimed he was on a tight schedule. Agent Smith thought this was strange since, in his experience, a pilot had never asked him to conduct the PCI away from the plane. Second, as Horrisberger exited the plane, he closed the door behind him. Agent Smith testified that pilots typically like to leave the doors open to allow air to flow in and out. Third, Horrisberger also kept the window curtains closed and left his passengers in the plane with the air conditioning off on a relatively warm day. Fourth, as Agents Smith and Sibley went through Horrisberger's documents, Horrisberger became agitated.

Several of these reasons appear innocuos. As shown by the defense, it appeared to be raining that day, so it does not seem odd for Horrisberger to keep the window curtains closed and shut the door behind him. Docket No. 47, Ex. 3. And it is not unusual for a person stopped by the police—especially those on a tight schedule—to become agitated. The Court acknowledges, however, that "[a]n analysis of reasonable suspicion is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable." *United States v. Ibarra-Sanchez*, 199 F.3d 753, 760 (5th Cir. 1999).

More compelling are the circumstances known prior to the PCI, particularly the Piper's association with Koutsos who was linked to two other planes suspected of drug smuggling. He was also the subject of two recent bulk currency encounters—one within the previous 15 months—in which thousands of dollars were seized. When these factors are considered together

9

with the agents' experience, the collective knowledge of the officers gave rise to reasonable suspicion and allowed the encounter to continue beyond the PCI.

C. **Probable Cause for Arrest**

The Fourth Amendment requires that a warrantless arrest be supported by probable cause. *United States v. Walker*, 960 F.2d 409, 416 (5th Cir. 1992). "An officer has probable cause for an arrest when the facts and circumstances within the knowledge of the arresting officer are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *United States v. McSween*, 53 F.3d 684, 689 (5th Cir. 1995) (quotation marks and citation omitted).

The government contends that the agents had probable cause based on their smell of marijuana outside the Piper. The Fifth Circuit has consistently held that the smell of marijuana alone may constitute probable cause. *Ibarra-Sanchez*, 199 F.3d at 760; *see, e.g., United States v. McKeever*, 906 F.2d 129, 132 (5th Cir. 1990) ("Distinctive odors, detected by those qualified to know them, may alone establish probable cause."); *United States. v. Newton,* 463 F. App'x 462, 466 (5th Cir. 2012) ("We have frequently held that probable cause to search may be based solely on a trained officer's detection of the odor of illicit drugs.").

Agent Smith testified that once the PCI was completed, he and Agent Sibley walked back to the Piper to check on the passengers. They smelled marijuana. The question is whether their testimony is credible.

Agent Sibley, the first officer that says he smelled the marijuana, neither submitted an affidavit nor testified at the hearing. Instead, the parties stipulated to the following testimony of Agent Sibley to "streamline" the hearing:

> [H]is testimony would be that . . . when Agent Martin Smith went to the plane and knocked on the door Grant Sibley was on the opposite side of the plane and during

10

> the knocking on the door he smelled . . . marijuana and then alerted Agent Martin
> Smith that he smelled the marijuana and then at that time he learned that Martin
> Smith also smelled the marijuana.

Hearing Trans. at 2.

The defense contends that Agent Sibley's account is not credible. They question whether Agent Smith, who was standing on the side of the plane where no door was located, could have smelled the marijuana contained *in* vacuum-sealed packages *in* black[7] garbage bags *in* the sealed airplane chamber. They argue that Agent Sibley's credibility is further undermined by the fact that the drug-detecting K-9 did not appear to give any positive indication for the presence of illegal drugs as it walked around the Piper. Even when the K-9 officer directed the K-9 to the open door of the Piper, it did not indicate a positive alert. Only when the K-9 was placed inside the Piper did it alert to the presence of drugs, and even that assertion is second-hand, based on what the officer *said* the dog did.

Defendants suggest it was scientifically unlikely that the agents smelled marijuana outside of the Piper when the K-9 did not. They have a point. The Supreme Court has noted that dog sniffs are "conducted to obtain information about the contents of private spaces *beyond anything that human senses could perceive*, even when conventionally enhanced." *Illinois v. Caballes*, 543 U.S. 405, 413 (2005); *see also Florida v. Jardines*, 569 U.S. 1, 12–13 (2013) ("[D]rug-detection dogs are highly trained tools of law enforcement, geared to respond in distinctive ways to specific scents so as to convey clear and reliable information to their human partners."). Given that drug-detecting dogs have a stronger sense of smell than humans do, it is hard to believe that the agents smelled the marijuana odor where the K-9 did not.

---

[7] Defendants have made repeated assertions about the color of the garbage bags as if to indicate that the color of the bag might impact the likelihood of whether one could smell the marijuana. The Court is not convinced that the color of the bags is relevant.

But other than Horrisberger's affidavit, there is no record evidence that challenges Agent Sibley's credibility.[8] And the Court is hesitant to credit Horrisberger's account of the dog sniff when he is not trained in drug detection. Expert testimony related to drug-detecting dogs, air flow in a plane cabin, or the science of vacuumed-sealed packs would have bolstered the defense's argument. The government proffered the testimony of two witnesses who both claimed they smelled the distinct odor of marijuana emanating from the Piper. Their testimony, viewed in light of their experience, justifies a finding of probable cause to arrest Horrisberger and Saechao.

### D. Probable Cause for Subsequent Search

"It is well settled that warrantless searches of automobiles are permitted by the Fourth Amendment if the officers have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *McSween,* 53 F.3d at 686. The smell of marijuana alone may constitute probable cause to search a vehicle. *Newton*, 463 F. App'x at 466. This rule applies to planes as well. In *United States v. Martinez-Perez*, the Fifth Circuit held that when law enforcement smelled marijuana, reasonable suspicion ripened into probable cause and justified the warrantless search of a plane. 941 F.2d 295, 299 (5th Cir. 1991).

As discussed above, probable cause existed based on the smell of marijuana by Agents Sibley and Smith. Therefore, the warrantless search of the Piper was permitted.

Relying on *Arizona v. Gant*, 556 U.S. 332 (2009), Defendants contend that the officers were not entitled to search the plane after Defendants were already handcuffed and in custody. Docket No. 47 at 9. In *Gant*, the Supreme Court limited an officer's ability to conduct a warrantless search of a vehicle pursuant to arrest. *United States v. Hinojosa*, 392 F. App'x 260,

---

[8] By stipulating to Agent Sibley's testimony, the movants surrendered their right to subject Sibley to vigorous cross-examination. Such an examination, in turn, could have led the Court not only to discount his testimony but to question the testimony of Agent Smith. Instead we have Sibley's unchallenged testimony that he smelled marijuana pitted against Horrisberger's affidavit.

12

261 (5th Cir. 2010) (citing *Gant,* 556 U.S. at 343). But the Court did not invalidate other exceptions to the warrant requirement. *Id* (citing *Gant*, 556 U.S. at 349). *Gant* is inapplicable here because the agents' search of the Piper was not made pursuant to arrest.

### E. Prolonged Detention

Finally, Defendants argue that their detention was unduly prolonged for 40 to 45 minutes while the drug-detecting K-9 was en route to the airport. They rely upon *Rodriguez v. United States* for the proposition that the police may not extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff. 135 S.Ct. 1609, 1616 (2015).

At the point agents requested the K-9 in this case, however, probable cause already existed. As such, Defendants' *Rodriguez* argument is unavailing.

## IV. Conclusion

The motion to suppress is DENIED.

**SO ORDERED**, this the 21st day of November, 2017.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE